Judge Underwood
delivered the opinion of the Court.
On the 23d of November, 1818, Davis and Ballard entered into a written contract, by which Davis agreed to convey certain lands to Ballard, who stipulated to pay $35 per acre therefor, as far as 200 acres, but all over that quantity, Ballard was to have without paying any more. Ballard agreed to pay $1000, on the 1st March, and $2000, on the 1st September, ensuing the date of the contract, and for the balance, $4000, Ballard, in the language of the contract, was “to execute his notes, to the said Davis, in four equal annual payments, from the day he gets possession.” Davis agreed to deliver possession on the 10th September, 1819, and bound himself to make a general warranty deed, upon Ballard’s making the foregoing payments.
On this contract, Davis instituted an action of covenant, assigning for breaches. 1st. The non-payment of the $2000, on the 1st September. And, 2d. A failure to execute the notes for the $4000, payable in instalments, as required by the contract. The declaration averred, that possession was delivered on the 10th September, 1819. The trial was had on two issues, one found for the plaintiff, the other against him. On the verdict, the court rendered judgment, on the 11th of March, 1823. On the 19th of March, 1827, Davis *564 sued out his writ of error, to reverse the judgment, Ballard pleads in bar of the writ of error, that it was brought and sued out, after the expiration of, and not within three years next after the judgment was rendered, in the inferior court.
Limitation of writs of error, 1 Dig. 390: Session acts, 1336, p. 30.
The validity of this plea, is the first question for consideration. It presents matter, alike new and important, and in the settlement of which, we are in a great degree, unaided, by the learning of those wbo have preceded us, in this or any other judicial tribunal. We have found no direct precedent, to direct us, Jt is a question growing out of the judicial embarrassments, which unfortunately existed in Kentucky, and the acts passed by the legislature, with a view to remedy the evil. We are urged in argument, to declare the remedial act, inoperative, upon the ground, that it violates the constitution of the state. To decide questions of this character, is often an unpleasant task; but when they are fairly presented, they should be disposed of, with that moral firmness, which arises from pure motives, and a conscious devotion tp official duty. The fear of displeasure, and the hopp pf temporary applause, shpuld have no place in the bosom of the judge.
It is declared by an act of 1816, that “no writ of error shall be brought or sued out, from pny court in this commonwealth, to reverse the judgmentor decree pf any court of law or equity, hereafter obtained, except in three years, next after the judgment or final decree, and not thereafter, any law to the contrary notwithstanding.” A proviso saves the rights of infants, femes covert, and persons of unsound mind. See 1 Dig. 390. The second section of an act, approved, January 11th, 1827, declares “that in writs of error, already sued out, or which maybe hereaftersued out, that the period between the 31st day of November, 1824, and the 1st of April, 1827, shall be deducted from the time allowed by law, in any plea, motion or suit, in which the statute of limitation of writs of error may be plead or relied on.” See session acts, 1826, 3Q. It is perfectly clear, under the first act referred to, that it would be the duty of the court to sustain the plea? in bar of the prosecution of the writ of erro^» *565 But if tbe act of 1827, cited, is operative, and the time between the 31stNovember, 1824, and 1st April, 1827, should, under the provisions of that act, be perly excluded, from the computation, and not counted as any part of time, out of which to make up the period of the three years, by which a writ of error may be barred, under the act of 1816, then, as there would not be three years, from the date of the judgment, to the date of the writ of error, the plea should be regarded as no bar. It has been contended that the expression in the act of 1827, requiring the period between 31st November, 1824, and 1st April, 1827, to be deducted from the time allowed by law, &c. was used by the legislature, with a view to shorten the limitation to writs of error, and that it would do violence to the intent of the legislature, as well as to the most obvious meaning of the words employed, to express that intention, if such a construction should be given to the sentence, as would prolong the time allowed for the prosecution of writs of error.
The act of 1827, Session joes nou-e^3 peal the act of 1816: l The"time for Suin*out writs of error, gdno^pdsr;0’a fr0m suit Nov. 1824, íoi7ls*Aprii’ ¿e computed01 but to be de-* ducted. -
We confess that the language used, has not been well selected, to convey most clearly, the idea intended to be expressed. Nevertheless, we think it sufficiently obvious, what was meant, to enforce that meaning, if the second section of the act, be not unconstitutional. The act of 1827, does not purport to repeal the act of 1816, and to substitute any shorter limitation to writs of error. The limitation of three years is to remain, but when that is relied on, in “any plea, motion or suit,” the period specified is to be deducted, and not to compose any part of the time relied on, in such plea. There must be three years without computing it. The plea, in this case, relies on the time running between the 11th March, 1823, and 19 th March, 1827, as being three years and more; but det duct, or take away from it, the period between 31st November, 1824, and 1st April, 1827, and there will not be three years left, to constitute a bar, as the law requires. The whole tenor of the act of 1827, shows this to be the proper construction. If, therefore, the act be compatible with the constitution, we must decide against the plea, and proceed to adjudicate on th§ errors assigned. >
‘The duty of the judiciary' to protect private rights .and private property, from any unconstitutional invasion, by legislative enactment, whether it result from accident or (design.
The clause of the constitution, immediately and directly violated by the act of 1827, has not been pointed out in argument; several have been mentioned incidentally, but it is mainly insisted, “that it violates the spirit of the instrume.nt, by invading Ballard's right of property, the protection of which, constituted one of the leading objects, which induced the people in convention, to form a constitution, as is manifested by the preamble." There is no clause in the constitution of Kentucky, which, in so many words, declares that the legislature shall not exorcise the power of divesting one citizen of his property, and giving it to another. The omission to inserta positive and direct restriction on legislative power, in this respect, may have proceeded from the belief, on the part of the convention, that a thing so destitute of moral principle, so corrupt in its tendencies, and so destitute of confidence in the justice of the government, would never be attempted. We cannot suppose that the representatives of the people, will ever debase themselves, in the estimation of the virtuous living, and render their memory infamous with posterity, by wilfully and corruptly seizing and depriving one citizen of his property, or vested rights, for the purpose of enriching and benefitting another.
If such a case should happen, charity requires; the honor and reputation of the country require, that it should be attributed to a negligent exercise of that wise forecast and deliberate consideration of consequences, which should always characterize legislators. It is to be regretted, that the exercise of much caution, even in deliberative assemblies, composed of many members, owing to the multitude of objects requiring attention, and the frailties incident to human nature, cannot always be brought to operate on every measure, so as to detect all resulting evils. Whenever, through the haste or inadvertence, or design of the legislature, it shall occur, that the right of the citizen has been invaded, contrary to the constitution, it is the duty of the judiciary to shield him from oppression. Although private property is not protected from legislative grasp, by any positive and express clause, prohibiting the general assembly from transferring the real or personal estate of one citizen to another, without consideration, and without the consent of the owner; yet, we think *567 that the exercise of such a power, would be unconstitutional, and that it would be the duty of the judiciary, to refuse obedience, to every such legislative act, whether it be designed to operate on the rights of one only, or on the rights of a particular class of individuals. To put two palpable cases by way of illustration. If the legislature were to pass an act, declaring that the farm, the slave, or the horse of A, should henceforth belong to B, and that the latter might institute the appropriate suit, in a court of justice, to recover the possession of the property, ought not the court to declare such act unconstitutional, and refuse to effectuate it? If the legislature were to pass an act, to deprive all merchants, or all mechanics of their property, and to vest it in the farmers, should courts of justice lend their aid to execute the act? These, and all similar enactments, in our opinion, would be unconstitutional, and we shall assign, with all practicable brevity, the reasons for such opinion.
Object of the framers of the constitution, to secure the enjoyment of life, liberty & property, and the pursuit of happiness.
The present constitution of Kentucky, was adopted at a time, when the natural, civil, and political rights of men, were well understood. The object in forming the constitution, was to protect these rights from encroachment, and as declared in the preamble, “to secure to all the citizens of the state, the enjoymént of the right of life, liberty, and property, and of pursuing happiness.” To preserve these great ends of all government, three distinct departments were instituted; each to consist of a separate body of magistracy, neither to be supreme in itself, but to act in its appropriate and prescribed sphere, the one wisely permitted to check the other, when that other may overleap the limits assigned to it; and the whole, together, representing the great body of the people, from whom their powers are derived, and in whom all power ultimately rests.
The enjoyment of life, liberty, and property, and the right to pursue happiness, embrace all the comforts and pleasures which man’s physical, intellectual, and moral nature is capable of acquiring, by the application and exercise of the various faculties with which he is endowed, and all that the world can afford him. The right to pursue happiness, includes the right to- *568 use all means necessary for its attainment, by the proper exercise of our faculties. The acquisition of property, to some extent at least, is indispensable to our most limited ideas of happiness. Food and raiment are property; and without food and raiment, existence cannot be preserved many days. Whether our acquisitions shall be limited to a bare subsistence, or shall be multiplied to the accumulation of every luxury* will depend upon the degree of labour employed, and the success of the business to which it may be directed; but it equally results^whether we have much or little, that one of the objects in the formation of the constitution, was to secure the enjoyment of that which we do possess and own. “We, the representatives of the people of the state of Kentucky, in convention assembled, to secure to all the citizens thereof, the enjoyment of the rights of life, liberty, and property, and of pursuing happiness, do ordain and establish this constitution for its government,” is the language of the preamble.
The 12th and J3th sections of the 10th article of the constitution, indicate the duty to be performed by the functionaries of the government, in the protection of the citizen.
If a man owns a farm, a slave, or a horse* food or raiment, the government was instituted to secure him in its enjoyment. If the government does not afford this security, it fails to perform one of the duties of its institution. If this right of propertyis invaded by the hand of violence, it is an injury to the owner. If the improvements on my farm are demolished, and toy personal property forcibly taken from me, by a wrong doery and these injuries are not redressed by the government* it cannot be said, that I am secured in the enjoyment of my pioperty. As applicable to cases like these, the 13th section of the 10th article of the constitution, speaks in language not to be misunderstood, and is clearly indicative of the duty, which the functionaries of the government owe to the citizens. “All courts shall be open, and every person, for an injury done him, in his lands, goods, person or reputation, shall have remedy by the due course of law,- and right and justice administered, without sale, denial or delay.”
The 12th section of the same article, also show's the great regard paid to the right of property by the constitution. It declares that “no person shall, for the same offence, be twice put in jeopardy of his life or' *569 limb; nór shall any man’s property betaken or applied to public use, without the consent of his representatives, and without just compensation being previously made to him.” It is perfectly obvious, that if these words, “or applied to public use,” had been omitted in the construction of the sentence; it would have been a positive and express prohibition, upon the power of the legislature, to deprive any man of his property, under any pretext, without the consent of his representatives, and without just compensation being previously made to him. The consent of his representatives alone, would not be sufficient to justify the act of deprivation; that consent ahd compensation to be previously made, are coupled together, by the copulative conjunction. Both must exist, anterior to taking the property, to render the taking constitutional.
Quere. Does not the contheuseof the disjunctive i^sec^Vart. inhibit the taking of A»s property, and giving it to B, as’Y?11 ft® of it'to pub-Ho use, with-9utconsent "aii0<n.mpen'
It is remarkable that the disjunctive conjunction or, is used after the word taken, thereby leaving it doubtfuí, whether the taking of property contemplated by the section, had reference exclusively and entirely to the taking of property for public uses, or whether it did not mean to prohibit the taking of property for any purpose whatever until its owner was first compensated, and his representatives had also' consented to it.
It is clear, that if the convention had intended to embrace the taking of property for public uses only, and notto provide against the taking of individual property at the mere will-or caprice of the Legislature, from one man or set of men, for the use of others without compensation, that it would have been more compatible with the structure and import of our language, to have used the word and, after the word taken, than to have used the word or. There is certainly more reason to prohibit the Legislature, from taking A’s property and giving it to B, without first paying A its value, than there is to prohibit the taking of it for public xise, without previously making a just compensation. The public exigence inimaginable cases may be such, that individual property may be required from the principle of necessity. In such cases, although it may and would be a violation of law to take it, without first making compensation; yet the maxim necessitas non habet legem, ought to excuse from the payment of vim *570 dictive damages and to exclude the idea of felony. If is difficult, if not impossible, to conceive a case where' reasons equally strong can be given, in extenuation of the taking of one man’s property, without compensation, for the use of another, under color of law, and without the owner having done any act, by which he renders the taking just and proper and legal.
The authority of the cases, Blair vs. Williams, and Lapsly vs, Brashears 4 Litt. 34 & 47, recognised-.
Any law which would impair the obligation of a contract, would impair the contract, and equally violate the constitution of Kentucky, and of the United States
*570 The 18th section of the same article, declares “that no expost facto law, nor any law impairing contracts shall be made.” The last clause is nothing more, nor less than a prohibition upon legislative power, the better to secure the right of property to the citizen. Ifa contract entitles a citizen to land or money, or any thing else, it is not to be impaired. All legislative acts, so far as they may impair a contract lawfully entered into, are void. If the contractcannot be touched, is it not absurd to suppose that the property paid, in discharge of the contract, becomes less sacred, as scorn as it is conveyed or delivered, by the obligor to the obligee. Can the legislature as soon as the obligee receives it, by an act for that purpose, compel him to restore it, (and that too, without compensation,) to the obligor? In the memorable cases of Blair, ¿ic. vs. Williams, and Lapsley vs. Brashears, &c. 4 Litt. 34 and 47, this court has expounded that clause in the constitution of the United States, which declares, Hhal no State shall pass any lam impairing the obligation of contracts.,'> Whatever impairs the obligation of a contract, will impair the contract itself, because the obligation contains the essence of all that is valuable in a contract. A -contract without obligation, or in other words without a remedy to enforce it, is worthless: or if it possessed any value, it would depend upon the degree of influence which moral considerations might have upon the conscience. By the authority of the above cases, the legal obligation consists in the remedy afforded by the law at the date of the contract for its-enforcement. It is this remedy which gives value to contracts.
We can perceive no reason for declaring any act of the legislature unconstitutional, under the foregoing clause of the Federal constitution, which ought not to-be equally condemned, under the constitution of the *571 State. Now would it not argue great weakness, if not .consummate folly, in the founders of our government, to provide thus carefully for the safety of contracts, against legislative alienations, and at the same time, leave the subject matter of nine tenths, if not ninety-nine hundredths, of all contracts, to-wit: property, completely exposed? If such be the result, the substance lias been lost in the pursuit of a shadow. But it is our opinion, that the substance is not in danger. For considering the great objects which are designed to be secured, the constitution of our government, as set forth in the preamble to the constitution, and the special provisions already noticed, we cannot resist the conclusion, that if would be a violation of the general tenure and spirit of the constitution, for the legislature to attempt, to deprive any citizen of his property, without previously providing compensation therefor. And whenever such acts are passed, we believe it to be the duty of the judiciary to disregard them, and consider them as nullities. We cannot perceive any reason, which, should compel the judiciary to obey a legislative act, at war with the tenor of the constitution, and the fundamental principles for the preservation of which the government was instituted, that would hot apply with equal force to produce obedience to a legislative act, directly opposed to any one of the positive inhibitions of the constitution. We grant that the representatives of the people are shepherds to preserve the flock; but they are not exclusively such, although vested with great and extensive powers. If through Inadvertence or design, they should endeavor to sacrifice any one or more, as victims, it can not be done, so long as the judiciary remains virtuous, intelligent and independant. Both departments must concur, to work iniquity before the people can be made to mourn, and in bitterness to curse their government. In that mutual check, lies their safety.
The act of 1827, Sessioli acts, 30, does not violate any provision ol the constitution. The judgment of an inferior court, erroneously rendered, is, at all times, subject to revision & reversal, should the legislature repeal the statute limiting the time for prosecuting writs of error. Such judgment cannot constitute a property in any individual, to which he can acquire right by laps of time. It does not create a right, it merely determines conflicting claims, according to pre-existing right. The revising court inquires what was right between the parties, in the original con,’reyersy?
*571 It remains to be decided, whether the act of 1827, invades Ballard’s right of property, and takes from him, that which is his,and gives it, without compensation, to another. If’it does, we disregard it; otherwise, enforce it. The direct operation of the act extends no further, than to permit the prosecution of the writ of error. It does not say that Ballard, shall surrender to Davis any *572 property. It does not pretend to decide, that Ballard has any property which belongs to Davis. It merely provides in its effect, that this court shall investigate a controversy between Ballard and Davis, which hat, been acted on in the circuit court, by whose decision Davis complains he has been injured, contrary to law; and if it be proved, that Davis’s complaint is true, that this court shall then afford adequate redress, not according to any new principle, established by the act of 1827, to operate retrospectively, but according to¡ the principles of law in force, operating upon the rights of the parties, at the time the circuit court adjudicated upon them. Does this deprive Ballard of any right of property? Surely it does not. Does it impair any contract of his? Certainly not. Davis complains of the judgment in the court below. Until we investigate it, the presumption is, that we shall affirm the judgment. In that event, Ballard will be altogether undisturbed in his rights, and will be entitled against Davis to the costs of this suit. If upon investigation, we reverse the judgment, it will be upon the ground that the court below, erred against Davis and refused to do him justice. If by a reversal, we give Davis full justice and no more, can Ballard complain that any right of his has been violated? Certainly he cannot. If he be resisting the administration of justice for Davis’s benefit, it must be because he has obtained an unjust advantage by the error oft he circuit court. For what then is Ballard contending? For nothing more nor less, than to permit injustice by lapse of time, to ripen into a perfect right. Any law which prevents this cannot be said to violate any principle of the constitution.
We know that statutes of limitation have been construed as permitting claims, originating in injustice, to grow into perfect rights, by the acquiescence of the injured party, during the prescribed period. Laws of this character, originate in considerations of public policy, and when enacted to operate prospectively, promote the peace and well being of society, without invading the rights of any. If we were willing to concede, that the repeal of a statute of limitation, would not authorize the original owner of the property, to prosecute a suit with success, against the holcjer whose *573 right had been perfected by the statute while in force, even if the legislature were to declare in the repealjng act, that the statute should not be relied on or stitute a bar; yet, we conceive, that there may be such a difference between such a repealing statute, and the statute now in question, as to constitute the latter an exception to the principles which at first view, would seem by analogy to apply to both. Under the operation of our ordinary acts of limitation, the holder, by virtue of the statute, may acquire such a perfect right in the ¡thing, in the property, as should place it in all respects in the attitude it would be in, had he always-owned it. Why may an ordinary act of limitation have this effect? ]3ecause, it co-operates with nature, aiding the title by Occupancy, which is the original and most substantial foundation upon which the right, to an exclusive dominion in and to the use of a thing can be placed. Occupancy in the face of the world, makes a sensible impression ; and the title thus enforced under the sanction of law, is recognized by the unhesitating common sense of mankind. But an erroneous judgment, is not possessed-, like real or personal estate. One party does dot exclude the other in respect to it. He does not seize- upon it against the right of the other. Neither has any control over it. It does not strike the senses of men like a tract of land, or any personal article; and therefore, does not admit that any one by lapse of time, «can acquire such a right in an erroneous judgment, of an inferior court, as to give him a property in the judg-r ment, so as to render it irreversable by this court, after the lapse of the time limited, by law, for the prosetion of a writ of error, in case the legislature think proper to provide for the review of such judgments. We apprehend that the judgment of a court cannot with propriety, be . denominated the property of any individual. A judgement or decree of a court, does no more, than decide between parties, their liabilities to each other, their rights of property, and their respective duties, according to the laws operating upon the Subject of controversy. The decision is authoritative hy the judge, but it does not give or create rights, it only determines pre-existing rights in such form, so that they can be enforced by execution or attachment.
The limitation, upon the time of prosecuting a writ of error, is a restriction by law, of a general right to take jurisdiction; the repeal of that limitation is a regulation by the legislature, restoring that right. The regulations of the time of suing out writs of error and the sums’ for which to be prosecuted are, by the constitution confided to the legiflainr
The parties in-an appeal or writ of error before ibis court, may still contend for their rights, as fixed by law at the commencement of the suit; hut that does not satisfy Ballard, he is willing to abandon them as they stood before the judgment, and to roly on that judgment and the matter o f his plea, as creating a property in him which cannot now be called in question. We think he has no such property, and that the act of 1816, providing a limitation of three years, which had fully expired before the act of 1827 was passed, did not give such a vested right in the subject matter of controversy or in the judgment as to render the latter act a violation of the constitution.
The second section of the fourth article of the constitution, declares, that “the court of appeals, except in cases otherwise directed by this constitution, shall have appellate jurisdiction only, which shall be co-extensive with the state, under such restrictions and regulations, not repugnant to this constitution, as may, from time to time, be prescribed by law.” The court of appeals was created by the constitution, as the tribunal of last resort, to which every citizen might appeal or prosecute writs of error. By the institution of the court, uniformity in decisions, throughout every branch of the judiciary, is secured, and a mode of settling controversies provided, admitting of more deliberation, from more míads, (han can be given to a case, in the hurried proceedings of inferior courts. Hence, there is greater reason to believe that exact justice will be administered between parties here, than in the inferior courts. Every citizen has an unquestionable constitutional right to bring his case, no matter how important or trifling it may be, before us for adjudication, subject only, to such restrictions and regulations as the legislature may prescribe by law. If the legislature should prescribe none, the appellate jurisdiction of this court would be ' unlimited. The limitation to the prosecution of a writ of error, is a restriction, in point of time., prescribed by law. If that restriction is removed by another law, this is no more than a regulation, by which the original right to take jurisdiction is reinstated. The constitution expressly authorizes the legislature to impose restrictions, and by regulations to remove them, provided nothing repugnant to the constitution shall *575 Be done At one time the prosecution of writs of error to reverse judgments, for sums less than fifty dollars, was prohibited by law. This law was repealed, and now a writ of error may be prosecuted to reverse a judgment for one cent. Suppose a judgment, while this restriction on our jurisdiction was in force, had been rendered for forty dollars, would the defendant in such judgment have a right to prosecute his writ of error after the prohibitory act was repealed, at any time, until he was barred by the statute of limitation? We think he would have such right. Precisely the same argument might be made against it, as is relied on in this case. Without a change of the law, no matter how erroneous the judgment for the forty dollars might be, it could not be reversed; by the reversal the plaintiff would be deprived of forty dollars, and on that account, might reiterate all the arguments used on this occasion, to show that the constitution was violated by the repealing act. We cannot view the laws which the legislature pass, limiting the jurisdiction of this court, again enlarging it, fixing the time within which writs of error shall be prosecuted, and then altering it,in any other light than as regulations, which the legislature may make, from time to time, as it may please. If a judgment shall be rendered during the present year for a cent, and the legislature should, at its next session, think proper to pass an act, prohibiting us from entertaining jurisdiction in the revision of the cause, on account of the trifling sum involved, we perceive nothing which should.' render a disregard of the law proper on our part. In such a case it might be contended, that as the judgment was rendered at a time when the law permitted the prosecution of a writ of error, that it was as much a violation of private right, and the principles of the constitution, to prohibit an investigation before this court, as it is to open a case for investigation after it has been closed.
It has been urged in argument, that it would be extremely dangerous to settle a doctrine, which would tolerate the legislature, from mere whim and caprice, to open all cases decided by the inferior courts since the foundation of the government. If those who advance the argument, could prove, that the legislature were always, or even frequently under the dominion of *576 whims and caprices, it might occasion regret, that the framers of our constitution did not oppose a barrier to such mischiefs. We are to decide what the constitution is; not what it ought to be. The members of the legislature are responsible to the people, for any criminal indulgence of whim and caprice, in making laws, and not to us. . We have to incur responsibilities enough, to our consciences and to our country, without overleaping our duty, to prescribe rules which may prevent others from violating lheir duty. It is just as unreasonable to suppose, because the legislature has the power, under the constitution, to prescribe regulations settling the cases over which our appellate jurisdiction shall be exercised, that they will permit no case to be brought before us, unless it be of the value of $>100,000, as, that they will permit every case to be brought up, from the foundation of the government. These things depend on the legislative will, which we are bound to obey, whenever it is not in conflict with the constitution.
filackstone’s definitian of law, not applicable to the character of our institutions, and the restricted power of the legislative department.
It has also been contended by Ballard’s counsel, that the act of 1827 is unconstitutional, because it operates retrospectively upon his case. “Law; signifies a rule of action,” and in its most general and comprehensive sense, is applied indiscriminately to all kinds of action. Municipal law may be properly defined to be a rule of civil conduct, prescribed by any power in a state, having, according to its constitution or form, of government, authority to act. Blackstone’s definition has been departed from, so far as he makes law depend on the supreme power in a state. Such a definition is not compatible with the genius of our forms of government, neither is it literally true as applicable to oar system. We acknowledge no supreme power, except that of the people. “Sovereignty and legislature are not convertible terms in this state, whatever they may be in England; and one actually does subsist without the other, which is denied by Biacksione. See 1 Com. 46. Instead of the legislature being sovereign, (a term to which we usually annex the idea of authority, without or beyond control,) it is limited in its power over many important subjects, which deeply concern the welfare of society, both by the state and federal constitutions. If trans- *577 bending these limitations, the legislature should attempt to prescribe rules of civil conduct, the ena'ctment is void.
“Law” is a rule of civil conduct, préscribed by competent authority;
The legislature possesses the highest power in making laws, but it cannot be said to be a supreme power, a term used, no doubt, by Black'stoné, in reference to the “omnipotence” of á British parliament, and thé monarchical governments of Europe. Trustees of towns and the agents and officers of corporations, may rightfully exercise the law making power, in many cases. The rules of civil conduct, prescribed by these law makers of inferior grade, are not the less obligatory, because they have not been directly prescribed by the géneral assembly. It is true their powers must be derived from the genéral assembly, but as Blackstone’s diñnition seems not to have included rulés of conduct, prescribed by derivative power, We have thought it not improper to define what we théan by lam, as applicable to our republican, representative system of government. Our constitution is the supremb law, prescribed by the supreme power. Our other laws do not come up to Blackstone’s definition.
As law, then, is a rule of civil conduct, prescribed by competent authority, can it, in the nature of things, be a rule by which any man can regulate his civil conduct, in times, past, before the law was enacted? It is impossible for any one to regulate his conduct, by a i-ule which has no existence; it, therefore, follows of necessity, that laws can only influence the conduct of men, after they are made. If the legislature attempt to apply their acts to the conduct and transactions of men, which took place before the passage of the law, So as to inflict punishment, it cannot be done. The constitution expressly forbids it, whenitsays,Mnoea;p<?sf facto law shall be made.” But we cannot give to this clause the éffect contended for in argument; we cannot enlargé its operation, so as to make it a positive restriction, upon the power Of the legislature to pass retroactive laws in all cases.
The supreme court of the United States, in the case of Calder and ux. vs. Bull and ux. 3 Dallas, 386, have considered the meaning of the clause in the constitution of the United States, which prohibits the states *578 fr0m passing ex post facto laws, and have decided that if related entirely to criminal matters. Judge Chase four kinds of laws which, in his opinion, would-be embraced by the prohibilion: 1st. Every law that' makes an action, done before the passing of the law, and which was innocent' when done, criminal, and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was when committed. 3d. Every law that changes the punishment and inflicts a greater punishment than the law annexed to the crime when committed; and, 4th. Every law that alters the. legal rules of evidence and receives less or different testimony than the law required at the time of the commission of the offence, in order to convict the offender. The exposilion of the supreme court of the nation, on this subject, has been regarded as binding authority, since 1798, when the opinions of the judges were, delivered, and we are not disposed to give any efficacy to the prohibition, beyond criminal' matters.
Tlie act of ¿ottíívest8 any right, or infringe the to9»!?*1'ost &S facto lam,” or Jaws impairiJation of-**' contract?, or impairing contracts, constitution of the United States, or of is valid.
This' court, in the Case of Fisbter vs Coekerill, 5> Sfonroe, 133, has acquiesced in the correctness of the' decision of the supreme court. But this latter case, is-nevertheless, strongly opposed' to the sanction of retrospective laws. In that' case,- the court enforced the' Provisions of the act of 1820, relative to occupying claimants, after it had been repealed, and they refer' to many cases, both of the English and American c.°urts, and to the doctrines-of the civil law under the Cassars, and also to the code of. Napoleon, for the purpose of shewing, that “all governments, which can pretend to any civilization, have repudiated the principles of retrospective laws.” We shall not pretend to deny, that retrospective laws, are in the general, impolitic, and unjust. They are ridiculous, when they attempt to prescribe rules, forthe past conduct of men; and we believe them unconstitutional, whenever they endeavour to deprive a citizen of a vested right of property, rendered full and perfect, by the existing laws, at the time of the passage of the retrospective act, which may contemplate a divestiture of such right. Laws when passed, may vest inchoate, or perfect rights’ in a citizen. The repeal of such laws, cannot repeal’ ©r take away the right. All the cases which are re *579 ferred to in Fisher vs. Cockrill, seem to us, to lack analogy, to the present, in one most essential particular.
In the present case, the act of 1827, does not prescribe any rule of action for Ballard. It does not pretend to take from him, any right, nor to repeal any law, ■which invests in him any right. It only provides, that a certain period, memorable in our judicial history, shall not be counted; and to whom is the direction given? who is to be governed by it as a rule of action? Surely, the direction is to this court, and it operates on us, as a prospective, regulation, which does not affect the rights of Ballard, in any manner whatever. In this respect, the present case seems to us, to differ essentially from any to which we have been referred.
This court, in the case of the commonwealth vs. M’Gowan, 4 Bibb, 64, decided, that if a right existed without a remedy to enforce it, that it was competent for the legislature to afford remedy, by a re-troactive •statute. The act of 1.809, referred to in the decision, did re-troact and operate upon facts existing, long anterior to its passage, whereby', M’Gowan was deprived of money, which, without the statute he would have held. The court first determined, that the statute of limitations did not run against the commonwealth, consequently, no right could vest in M’Gowan, by the running of the limitation. It is even intimated, that the statute of limitations might be repealed, so as to invest those with their original rights, who had been divested by its operation. In Colder vs. Bell, judge Chase very strongly intimates, that “to save time from the statute of limitations retrospectively,” may be proper or necessary according, to circumstances, and could not be objected to. On these points, it is unnecessary to express an opinion. It is sufficient for our present purpose, to present in the case of the commonwealth vs. M’Gowan, a retrospective act of the Legislature,, sanctioned by this court, whereby a citizen was deprived of money, which he would have held, but for the act. It is very common for our legislature, to legalize erroneous proceedings of county courts, by retrospective acts. These have never been called in question, so far as we know. If sound policy, and the *580 constitution permits that, why should they prohibit the legislature from authorizing the court of appeals, to - correct the erroneous proceedings of inferior courts? The position, that all retrospective legislation, is void, is too,broad to be supported. That it is so, whenever it attempts to impose responsibility, criminaliter, there can be no doubt; that it is likewise so, when it attempts fo invade the right of property, or rights growing out of contracts, we also concede; but further,, we are not willing to. extend the doctrine. We have already said, that our-judicial, proceedings, do not create rights of property, but only determine rights previously existing. So long as a judgment or decree, remains in full force, it is conclusive evidence of what the right was, and to whom it appertains, and nothing more. Our statutes, for instance, providing for the appropriation of vacant lands, and; the consummation of- the provisions of the statutes by grant, create, rights. The decision of a court of justice, that a particular traGt belongs to A, and that he shall recover it from B, does not create a . right in A; it only decides, that such a right, had been previously created, superior to that asserted by B; and in all future controversies between them, the decision is merely conclusive evidence. The interest- of society requires, that the records of our courts, should exhibit correctness. This court was created to revise and correct the errors of inferior judicial tribunals. The mode, of proceeding by which the object is to be attained, depends on the remedial regulations made from time to time, by the legislature. Over remedies, the legislature has absolute controul; provided,.under cok our of- remedy, life, liberty, the rights of property, or those resulting from contracts are not impaired or prostrated, contrary to the constitution. By the act of 1827, the legislature has done no more than to provide a remedy, demanded by the community, to heal the wounds of .political- warfare. We do not perceive that it does or can operate against any man’s right, and therefore, we shall disregard the plea, and proceed to examine the errors assigned. In doing so, the laws In force, at the time of rendering the judgment, as they operated upon the rights of the parties, will govern us. If when tested by these, full justice has been done, Ballard is in no danger. If the judgment *581 cannot stand the test, it would be a reproach "and a stigma on the government, to say, that it did not possess power to make it right. The question is one novelty and importance. The ablest men may be divided in opinion upon it. It would therefore, be presumptuous in this court, to express entire confidence in the correctness of the conclusions, to which it has arrived. But surely, it cannot be the province of any court, to vacate the act of 1827, passed with the best motives, for the best purposes, without the clearest conviction of its unconstitutionality.
if replicaban put in issue,a of ^nted by^á plea, and it. be found for def’t. it is correct to enter judgment, that pl’tff.' take nothing' for breach of covenant, to which tne plea was an answer.
*581 By the contract on which the suit is founded, it is de? dared to be understood between the parties, “that a Ijttle alteration in the lines of the said survey, will be made, when this contract is closed, and the land surveyed to said Ballard, so as to include a small piece exchanged for, with George Shackelford, and take out the piece, which the said Davis has contracted, to let the said Shackelford have. This being done, the said Ballard is to pay the said Davis, for the aforesaid tract, at the rate of $35 per acre, &c. The defendant’s first plea, alleges, the land had not been surveyed, as contemplated by the contract, upon which issue was taken. The second plea alleges, that Davis did not deliver possession of the land on the 10th September, as requred by the contract, nor at any time since. On this plea, issue was likewise taken, by replying, that the possession was delivered on the 10th day of September; 1819, and without gainsaying the averment in the plea, that it had not been delivered at a subsequent time, the jury fqund for the '^plaintiff upon the first plea, and assessed his damages to §2420, and they found for the defendant upon the second plea. Upon this finding, the court gave the plaintiffjudgment for the damages assessed and costs; and also, that the, plaintiff should recover nothing of the defendant, upon the second breach assigned in his declaration.
The secqnd breach in the declaration, claimed damages for an alleged failure on the part of Ballard,.to execute his notes for the instalments, according to the covenant. It is clear from the covenant, that Ballard yvas not bound to give his notes, until possession was delivered. Davis having put the fact of delivery 0f *582 possession in issue, and confined it to a certain day, he has admitted that part of the plea, to be true, which avers, that possession was not delivered, subsequent to that day. His declaration does not shew that possession was to be delivered, before that day. The cov/enant shews clearly, that Ballard was not bound to give his notes, until he got possession. The jury having found, that possession was not delivered, as stated by Davis, the court was right in entering judgment against Davis’s right to recover upon his second breach. We do not believe, that this judgment of the court, would bar Davis’s right to recover upon a breach, differently assigned, but it is conclusive against him, upon the facts, as alleged in the declaration, and putin issue by the plea and replication. We think the plena good answer to the second breach assigned, and consequently there is no error in the decision of the inferí? or court.
Caperlon, for plaintiff; Turner, for defendant?
The questions made and presented by Ballard’s counsel, in his brief, need not be considered, as the judgment cannot be reversed on the writ of error, presented by Davis.
The judgment is affirmed, and Ballard must recoy' his costs.