RENDERED: NOVEMBER 15, 2018
TO BE PUBLISHED

## Supreme Court of Kentucky

FINAL

DATE 2/14/19 Kim Redmon, DC

2017-SC-000614-TG
2017-SC-000615-TG

COMMONWEALTH OF KENTUCKY,                                         APPELLANT
CABINET FOR HEALTH AND FAMILY
SERVICES, EX REL. ADAM MEIER, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF
THE CABINET FOR HEALTH AND FAMILY
SERVICES


                          ON APPEAL FROM COURT OF APPEALS
V.                                CASE NO. 2017-CA-001770
               FRANKLIN CIRCUIT COURT NO. 17-CI-00708


EZRA CLAYCOMB, A MINOR, BY AND                                   APPELLEES
THROUGH HIS NEXT FRIEND, NATURAL
GUARDIAN AND PARENT, TONYA
CLAYCOMB AND TONYA CLAYCOMB, ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED


### OPINION OF THE COURT BY CHIEF JUSTICE MINTON

### AFFIRMING

Of all the rights guaranteed by state constitutions but absent from the

federal Bill of Rights, the guarantee of a right of access to the courts to obtain a

remedy for injury is possibly the most important.[1] Kentucky's version of this

guarantee, referred to in our jurisprudence as the open-courts provision,

---

[1] Thomas R. Phillips, *The Constitutional Right to a Remedy*, 78 N.Y.U. L. Rev. 1309, 1310 (2003).

appears in the Bill of Rights, Section 14, of the Kentucky Constitution, which states: "All courts shall be open, and every person for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

The Kentucky General Assembly in its 2017 regular session enacted Kentucky Revised Statutes ("KRS") Chapter 216C, the Medical Review Panel Act, establishing a mandatory process to delay certain medical-malpractice claimants' ability to access immediately the courts of the Commonwealth by creating medical-review panels and requiring a panel's opinion about the merits of the claimant's proposed complaint against health-care providers before the claimant may file suit. This case presents to us on discretionary review a legal challenge to KRS Chapter 216C in which the trial court declared the Act unconstitutional on several grounds. We hold that because the Act delays access to the courts of the Commonwealth for the adjudication of common-law claims, Chapter 216C violates Section 14 of the Kentucky Constitution.

## I. BACKGROUND.

### A. The General Assembly enacts the Medical Review Panels Act.

KRS Chapter 216C "provides for the establishment of medical review panels to review proposed malpractice complaints against health care providers . . . ."[2] KRS 216C.020(1) makes clear:

> All malpractice and malpractice-related claims against a health care provider, other than claims validly agreed for submission to a binding arbitration procedure, shall be reviewed by a medical

---

[2] KRS 216C.005.

review panel. Such an action may not be commenced in a court in Kentucky before:

(a) The claimant's proposed complaint has been presented to a medical review panel established under this chapter; and

(b) An opinion is given by the panel. If the panel has not given its opinion within nine (9) months after the filing of the proposed complaint, the plaintiff may commence the action in court.

KRS 216C.010(4) defines *health care provider* to mean:

[A]ny health facility as defined in KRS 216B.015, or a provider, including natural persons, of health care or health services, including, but not limited to those licensed, certified, registered under, or subject to KRS 194A.700 to 194A.729 or KRS Chapter 310, 311, 311A, 311B, 312, 313, 314, 314A, 315, 319, 319A, 320, 327, 333, 334A, or 335 and the current and former officers, directors, administrators, agents, or employees of any such persons or entities acting within the course and scope of their office, employment, or agency.

In other words, as the trial court noted, the medical review panel must first review any malpractice or malpractice-related claim filed on or after June 29, 2017, against any individual or entity bearing some sort of relationship to the health care profession and industry, "other than claims validly agreed for submission to a binding arbitration procedure,"[3] before that claim is subject to adjudication:

Any action involving a dependent claim accruing after June 29, 2017, shall be immediately and automatically stayed until:

(a) The claimant's proposed complaint against the health care provider has been presented to a medical review panel established under this chapter and an opinion is given by the panel; or

---

[3] KRS 216C.020(1).

3

(b) Nine (9) months after the filing of the proposed complaint if the panel has not given its opinion.[4]

The panel does not engage in any adjudication of a claimant's claim.[5] Rather, the entire purpose and function of the panel is to generate an opinion about the merits of the claim, an opinion that may or may not have any evidentiary usefulness in a court of law.[6] Finally, Chapter 216C does allow the parties to bypass medical review panel review, but only if *all* parties involved in the action agree.[7]

## B. The trial court declares the Medical Review Panels Act unconstitutional.

Ezra Claycomb, a minor, by and through his next friend, natural guardian, and parent, Tonya Claycomb, individually and on behalf of all others similarly situated, sued the Commonwealth in the trial court, challenging the constitutionality of Chapter 216C. Ezra suffers from severe brain damage and cerebral palsy allegedly caused by medical malpractice. But for Chapter 216C, Claycomb could immediately file a medical-malpractice suit in circuit court.

Claycomb specifically argued in the trial court that Chapter 216C violates: (1) the equal protection and due process guarantees under Sections 1, 2, and 3 of the Kentucky Constitution; (2) the open-courts and jural rights

---

[4] KRS 216C.020(2).

[5] A party to the action or a panel member may invoke the jurisdiction of a court of the Commonwealth that would otherwise have subject-matter jurisdiction over the case but only for the limited purpose of ruling on certain motions allowed by Chapter 216C, none of which allow adjudication of a claimant's case. *See* KRS 216C.240; KRS 216C.250.

[6] *See* KRS 216C.180.

[7] *See* KRS 216C.030(1).

guarantees under Sections 7, 14, 54, and 241; (3) the separation of powers doctrine under Sections 27, 28, 109, and 116; (4) the prohibition against special legislation under Sections 59 and 60; and (5) the subject and title requirements of Section 51. The trial court found violations of the equal protection guarantee, the prohibition against special legislation (although did not provide an analysis of that issue), the separation of powers doctrine, and the open-courts and jural rights guarantees but found that Chapter 216C did not violate the subject and title requirements of Section 51.[8] The trial court found the entirety of Chapter 216C unconstitutional and permanently enjoined the Commonwealth from enforcing any of its provisions.

The Commonwealth then requested in the Court of Appeals emergency relief from the trial court's order under Kentucky Rule of Civil Procedure ("CR") 65.08(7) and suspension of the enforcement of the permanent injunction under CR 65.08(2), which the Court of Appeals granted. This Court then accepted transfer to decide the merits of the case.

## II. ANALYSIS.

At the outset, we note that our analysis focuses solely on Section 14 of the Kentucky Constitution because we find Chapter 216C violates that constitutional provision.[9]

---

[8] It appears that Claycomb has abandoned his Section 51 challenge in this appeal.

[9] Because we find a violation of Section 14, which results in the striking down of Chapter 216C in its entirety, we need not reach Claycomb's other constitutional challenges.

## A. Section 14 acts as a limitation against all departments of government interfering with its guarantees.

For more than two and a quarter centuries, the language of Section 14 has appeared verbatim in all four of Kentucky's constitutions, first as Article XII, § 13 of the original one in 1792. But as the former Dean of the University of Kentucky College of Law, the late Thomas R. Lewis, notes in his scholarly analysis, the remedy guarantee provided for in Section 14 is an ancient right dating from Magna Carta in 1215.[10]

Tracing the pedigree of Section 14 to Magna Carta brings up a fundamental question with which Kentucky's highest court has famously struggled since the antebellum years of the Commonwealth: Is Section 14 a limitation on *all* departments of state government interfering with its guarantees, or *just the judiciary?*

Dean Lewis's ultimate conclusion about the reach of Section 14, as confirmed by his study of the historic explication of the right by Sir William Blackstone, is: "[T]hat common law courts resolve disputes, creating precedents, and thus law, in the absence of governing legislation *but subject to modification by the people through their elected representatives.*"[11] In other words, Blackstone and Dean Lewis would likely argue, as has the Commonwealth in this case, that the constraints on government reflected in Section 14 do not apply to the popularly elected legislature.

---

[10] Thomas Lewis, *Jural Rights under Kentucky's Constitution: Realities Grounded in Myth*, 80 Ky.L.J. 953, 964–65 (1991–92).

[11] *Id.* (emphasis added).

6

Almost 200 years ago, this Commonwealth's highest court "found that access to courts was 'clearly indicative of the duty which the functionaries of the government owe to the citizens' and that if 'it shall occur that the right of the citizen has been invaded contrary to the constitution, it is the duty of the judiciary to shield him from oppression.'"[12] In *Commonwealth ex rel. Tinder v. Werner,* the court identified the history of its decisions related to striking down acts of the legislature that sought to restrict plaintiffs' rights to the redress of civil wrongs.[13] In *"Blair v. Williams*[14] and *Lapsley v. Brashears,*[15] [Kentucky's highest court] held unconstitutional an act of the legislature permitting a stay of two years on the debtor giving bond and security unless the creditor endorsed on his execution a willingness to accept notes on the Bank of Kentucky or the Bank of the Commonwealth of Kentucky . . . ."[16] Those decisions "nearly destroyed this court:"

> As was foreseen, those decisions produced very great exasperation and consequent denunciation of the court. The Judges were charged with arrogating supremacy over the popular will—their authority to declare void any act of the Legislature was denied, and they were denounced by the organs and stump orators of the dominant relief party as usurpers and self-made kings. No popular controversy, waged without bloodshed, was ever more absorbing or acrimonious than that which raged, like a hurricane, over

---

[12] Michael L. Buenger and Paul J. De Muniz, *American Judicial Power: The State Court Perspective,* 200–01 (2015) (quoting *Davis v. Ballard,* 1 J.J. Marsh. 563, 568 (Ky. 1829)).

[13] 280 S.W.2d 214 (Ky. 1955).

[14] 14 Ky. 34 (Ky. 1823).

[15] 14 Ky. 47 (Ky. 1823).

[16] *Werner,* 280 S.W.3d at 215.

Kentucky for about three years succeeding the promulgation of those judicial decisions.[17]

Some years later, after the "hard money" fight had subsided, the court in

*Johnson v. Higgins*[18] and *Barkley v. Glover*[19] "held that Section 14 of the

[Kentucky] Constitution was a limitation on the judicial branch of the

government and not a limitation on the legislative branch, and that it

prohibited the courts from arbitrarily delaying or denying to its citizens the

administration of justice, but constituted no limitation upon the legislature in

formulating procedural methods to be used by the courts."[20]

This rule changed with the decision in *Ludwig v. Johnson*, the seminal

case establishing the open-courts and jural rights doctrines in Kentucky

jurisprudence, which stated:

> [I]t is said in effect that section 14 of our Constitution is a
> restriction on the judicial, and not on the legislative, branch of
> government, but this observation was unnecessary in the decision
> of those cases, and is clearly unsound in view of section 26 of our
> Constitution, which is the concluding section of the Bill of Rights,
> and which reads: "To guard against transgression of the high
> powers which we have delegated, We Declare that everything in
> this Bill of Rights is excepted out of the general powers of
> government, and shall forever remain inviolate; and all laws
> contrary thereto, or contrary to this constitution, shall be void."[21]

So our predecessors on the Commonwealth's highest court recognized in

*Ludwig* that when Section 14 is read in conjunction with Section 26, the Bill of

---

[17] *Id.* (citing Arndt Mathias Stickles, *The Critical Court Struggle in Kentucky, 1819–1829* (1929)) (quoting George Robertson, *Scrap Book of Law and Politics, Men and Times* (1855)).

[18] 60 Ky. 566 (Ky. 1861).

[19] 61 Ky. 44 (Ky. 1862).

[20] *Werner*, 280 S.W.2d at 215 (internal citations omitted).

[21] 49 S.W.2d 347, 351 (Ky. 1932).

Rights of the Kentucky Constitution establishes "a limitation on the power of the legislature to enact laws which are in contravention of the plain provisions of Section 14."[22] This conclusion led our predecessors in *Werner* to the ultimate conclusion "that section 14, when construed in the light of section 26, prohibits the legislature from invading the province of the judiciary and that the prohibition of section 14 applies to the legislative branch of the government as well as to the judicial."[23]

This Court has never retreated from that position, and we find no reason to do so today.

Sir Edward Coke and Blackstone, two of England's most preeminent legal scholars, undeniably viewed the ancient guarantees now reflected in the language of Section 14 of Kentucky's Constitution as checks on royal abuse, not on parliamentary excesses. With all due respect to the conclusion reached by Dean Lewis, who would exempt the modern legislative branch from the constraints of Section 14, that conclusion overlooks a fundamental difference between English and American jurisprudence:

> Unlike Coke and Blackstone, the rebellious American colonists saw both the Crown *and Parliament* as oppressors.[24] Parliamentary initiatives during the 1760s and 1770s convinced the colonists that the informal constitution securing English rights against royal infringement *was inadequate to protect against all forms of*

---

[22] *Werner*, 280 S.W.2d at 216.

[23] *Id.* at 216.

[24] Jonathan M. Hoffman, *By the Courts of the Law: The Origins of the Open Courts Clause of State Constitutions*, 74 Or. L. Rev. 1279, 1301 (1995) (discussing Britain's perceived interference with American colonial courts leading up to the American Revolution and comparing colonial grievances over royal abuses with conflict between Coke and Crown 150 years earlier). "Lord Coke was a fervent advocate of parliamentary supremacy, whereas the colonists ended up resisting parliamentary as well as royal authority." *Id.*

*government oppression.* When independence was declared, some of the new American states began adopting formal written constitutions to structure their new governments and to help secure their most fundamental rights. As Gordon Wood notes, they recognized that laws protecting their basic freedoms must be of "a nature more sacred than those which established a turnpike road"[25].[26]

Furthermore, "[i]n contrast to England . . . early state constitutions transformed the right from a restriction on monarchical power to a positive obligation to provide access to an independent judiciary for vindication of rights, *particularly against overreaching legislatures.*"[27]

As the Tennessee Supreme Court has explained:

This declaration, copied from the great charter [Magna Carta], is not a collection of unmeaning epithets. In England, the reason of riveting this barrier around the rights of the subject was well understood. Their sovereign was wont to interfere in the administration of justice; "a remedy by due course of law" was often refused, under the mandate of men in power, and the injured man denied justice; *they were ordered sometimes not to proceed with particular causes, and justice was delayed*; and the obtainment of their rights was often burdened with improper conditions and sacrifices, and justice was sold. So anxious were they to stop this enormous evil, that a part of the official oath of a judge was that he would proceed to do right and justice, notwithstanding any letter or order to him to the contrary.

This clause of *Magna Carta,* why is it inserted in our Bill of Rights? Was it from apprehensions of our executive? We had left him no power. Whatever power is considered as properly belonging to the executive department elsewhere is, by our institutions, conferred upon the legislature. It is the more important, therefore, and so the framers of our constitution decreed, that the judicial department

---

[25] Gordon S. Wood, *Foreword: State Constitution-Making in the American Revolution,* 24 Rutgers L.J. 911, 920 (1993) (citing *The Crisis, No. XI,* 81–87 (New York 1775)).

[26] Phillips, *supra* note 1 at 1323; *see also,* William C. Koch, Jr., *Reopening Tennessee's Open Courts Clause: A Historical Reconsideration of Article I, Section 17 of the Tennessee Constitution,* U. Mem. L. Rev. (1997) ("Few courts continue to insist that the open courts provision has no application to legislative actions.").

[27] Buenger and De Muniz, *supra* note 12 at 200 (emphasis added).

should be independent and coordinate, and that the legislature should have no judicial power. Danger might justly be apprehended from this quarter. If the legislature, possessing a large share of executive power, be permitted to exercise judicial power also, or control the action of the judges within their peculiar sphere, the liberty of the citizens, under the government of good legislators, would be in imminent peril, and under bad ones would be entirely destroyed.[28]

Although much of our law is rooted in English law, we cannot ignore the fundamental distinctions that developed in America. The framers of written constitutions for the new American states were clearly wary of the power of *all* branches of government. "Many framers of the original state constitutions in colonial America adopted [Section 14's guarantees] as their own, recognizing it as a constraint on both judicial and legislative power."[29]

To characterize, as the Commonwealth insisted at oral argument, certain sections of the Kentucky Bill of Rights as applying only to the judicial department of the Commonwealth is to ignore the common understanding of the original framers and the original meaning of the words they employed—*all* branches of government can oppress the people and such oppression must be guarded against. So the framers of Kentucky's First Constitution included Section 28 in the Kentucky Bill of Rights: "To guard against transgressions of the high powers which we have delegated, WE DECLARE, that everything in this article is excepted out of the general powers of government, and shall forever remain inviolate; and that all laws contrary thereto, or contrary to this

---

[28] *Id.* (quoting *Fisher's Negroes v. Dabbs*, 14 Tenn. 119, 137–38 (Tenn. 1834)) (emphasis added).

[29] Phillips, *supra* note 1 at 1304.

11

Constitution, shall be void."[30] This is the same provision, now Section 26, that this Court in *Ludwig* identified as making clear that Section 14 applies to *all* branches of government.

Based upon the plain text of Section 14, its history, and our long-standing precedent interpreting its reach, we hold that Section 14 acts as a restraint on the power of all departments of state government. As Justice Hughes observed at oral argument of this case, Section 14 is a right "of the people," and the people deserve to be protected against all departments of government infringing on their right to seek immediate redress for common-law personal-injury claims.

### C. The plain words of Section 14, coupled with a historical understanding of the remedies guarantee offered by it, mandate that Chapter 216C be declared unconstitutional.

Now that we have clarified that Section 14 does apply to all departments of government, we turn to evaluating its implications for the case at hand. In our review, we must remember our duty to presume that the statutes we address are constitutional.[31] Additionally, "[i]t is a well-established principle that '[a] facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."[32] "The violation of

---

[30] Ky Const. Art. XII, § 28 (1792).

[31] *Utility Mgmt. Grp, LLC v. Pike Cnty Fiscal Court*, 531 S.W.3d 3, 12 (Ky. 2017) (citing *Curd v. Ky. State Bd. of Licensure*, 433 S.W.3d 291, 305 (Ky. 2014)).

[32] *Harris v. Commonwealth*, 338 S.W.3d 222, 229 (Ky. 2011) (quoting *Rust v. Sullivan*, 500 U.S. 173, 183 (1991)).

the Constitution must be clear, complete and unmistakable in order to find the law unconstitutional."[33]

We have held that Section 14 protects "[t]he right of every individual in society to access a system of justice to redress wrongs," and such protection "is basic and fundamental to our common law heritage."[34] The right to a remedy protected in Section 14 applies to actions for death and personal injuries, among other types of actions.[35] And medical-malpractice claims fall under this category of claims.

"The most widespread and important . . . provision [of states' bills of rights] is probably the guarantee of a right of access to the courts to obtain a remedy for injury."[36] "It is one of the oldest of Anglo-American rights, rooted in Magna Carta and nourished in the English struggle for individual liberty and conscience rights."[37] Former Chief Justice of the Texas Supreme Court Thomas Phillips sheds light on the origin of the rights secured by Section 14:

> The motivations for the original guarantee are actually easier to discern than those of our own states' framers. The barons had little interest in abstract pronouncements of ideal governance; they were after specific language to compel particular action.[38] The barons were displeased because the royal courts, which fast were

---

[33] *Kentucky Indus. Util. Customers, Inc. v. Kentucky Utils. Co.*, 982 S.W.2d 493, 499 (Ky. 1998).

[34] *O'Bryan v. Hedgespeth*, 892 S.W.2d 571, 578 (Ky. 1995).

[35] *Fireman's Fund Ins. Co. v. Government Emps. Ins. Co.*, 635 S.W.2d 475, 477 (Ky. 1982) (internal citations omitted) (overruled on other grounds by *Perkins v. Northeastern Log Homes*, 808 S.W.2d 809 (Ky. 1991)).

[36] Phillips, *supra* note 1 at 1310.

[37] *Id.* (citing A.E. Dick Howard, *The Road from Runnymeade: Magna Carta and Constitutionalism in America*, 6–8 (1968)).

[38] *See* William Sharp McKechnie, *Magna Carta: A Commentary on the Great Charter of King John* 51–52, 120 (2d ed. 1914).

displacing local feudal courts as the preferred forum for dispute resolution, operated on a fee scale, with different charges for particular writs. "The system invited abuse; more expensive writs worked faster than cheaper ones, were more potent, and could achieve access to a more favorable forum."[39]

The rights guaranteed by Section 14 arose to prevent royal abuse through the courts: "These provisions were intended to address two abuses in England's medieval justice system: (1) the random exploitation of judicial power without lawful judgment, and (2) the practice of the selling of writs to gain access to the King's courts."[40] The framers of our own Constitution recognized this, as well:

> We have all read that King John had the habit of gathering gear by every wile that was justified by honor, and a good many that were not . . . . When he went hunting or junketing about the kingdom his justiciary was at his heels, under the idea that the King, as the fountain of justice, must be present in person as in theory when an appeal for justice should be made by one of his subjects. But in consequence the nomadic nature of the court—here to-day and gone to-morrow—there were the most intolerable delays in the administration of justice . . . . So, when he was confronted by the old barons who had assembled on the plain of Running Mead (sic) to persuade him to accede to the demands suggested by Langdon, he graciously promised that he would ". . . delay justice to no man . . . ."[41]

Sir Edward Coke, in his Second Part of the Institutes of the Laws of England,[42] described the rights guaranteed by Section 14 as a "'roote' from

---

[39] Phillips, *supra* note 1 at 1320 n.35. (quoting David Schuman, *Oregon's Remedy Guarantee: Article I, Section 10 of the Oregon Constitution*, 65 Or. L. Rev. 35, 37 (1986)).

[40] Buenger and De Muniz, *supra* note 12 at 200.

[41] 1 *Debates of the Constitutional Convention of 1890*, 732, (1890)(J. Proctor Knott, Madison County).

[42] Phillips, *supra* note 1 at 1320 (citing Hastings Lyon & Herman Block, *Edward Coke: Oracle of the Law*, 348 (1929)).

which 'many fruitful branches of the law of England have sprung.'[43] "One such branch was the protection of individuals' rights from official acts of oppression . . . ."[44] "Another was 'the rights of subjects in their private relations with one another . . . .'"[45] Coke further stated about the rights as guaranteed in Section 14:

> [E]very subject of this realm, for injury done to him in goods, lands, or person, by any other subject . . . may take his remedy by the course of the law, and have justice, and right for the injury done to him, freely without sale, fully without any denial, and speedily without delay . . . .[J]ustice must have three qualities; it must be . . . free; for nothing is more odious than Justice let to sale; full, for justice ought not to limp, or be granted piece-meal; and speedily, for delay is a kind of denial; and then it is both justice and right.[46]

During the next century, Sir William Blackstone described the right to a remedy as one of the critical means through which a civilized society served its principal aim—the preservation of an individual's absolute rights to life, liberty, and property.[47] Blackstone identified three absolute rights: "personal security, personal liberty, and private property."[48] "Personal security include[s] the right to life and limb, and . . . to body (freedom from assault), health, and reputation."[49]

---

[43] Phillips, *supra* note 1 at 1320 (quoting Edward Coke, *The Second Part of the Institutes of the Laws of England*, 45 (photo reprint 1986) (London, W. Clarke & Sons 1817) (1641)).

[44] Phillips, *supra* note 1 at 1320 (quoting Coke, *supra* note 38).

[45] Phillips, *supra* note 1 at 1320.

[46] Phillips, *supra* note 1 at 1320 (quoting Coke, *supra* note 38).

[47] Phillips, *supra* note 1 at 1321 (citing William Blackstone, *Commentaries on the Law of England*, 124 (1765)).

[48] Phillips, *supra* note 1 at 1321 (citing Blackstone, *supra* note 42 at 125 and 129).

[49] Phillips, *supra* note 1 at 1321.

Blackstone described the right to a remedy as "one of the five subordinate rights through which people vindicated their absolute rights, and it encompassed both the substance of the law and the procedures through which courts applied that law."[50] Once a person was injured, the right to an "adequate remedy" immediately attached, though judicial process might be necessary to ascertain the exact parameters of that right.[51] "The right to a remedy dictated that common-law courts exercise general jurisdiction, being open for all cases involving injury to individual rights, '[f]or it is a settled and invariable principle . . . that every right when withheld must have a remedy, and every injury its proper redress.'"[52]

So Blackstone was "concerned [with both] the physical availability of judicial process [and] with the substantive opportunity to assert claims to protect absolute rights."[53] As Blackstone stated, "'Since the law is . . . the supreme arbiter of every man's life, liberty, and property, courts of justice must at all times be open to the subject, and the law be duly administered therein' to satisfy the subordinate right of 'applying to the courts of justice for redress of injuries.'"[54]

Coke and Blackstone observed that included among the rights protected by the remedies guarantee are "the rights of subjects in their private relations

---

[50] Phillips, *supra* note 1 at 1321 (citing Blackstone, *supra* note 42 at 141–44).

[51] Phillips, *supra* note 1 at 1322 (citing Blackstone, *supra* note 42 at 116).

[52] Phillips, *supra* note 1 at 1322 (quoting Blackstone, *supra* note 42 at 109).

[53] Phillips, *supra* note 1 at 1322 (citing Blackstone, *supra* note 42 at 141).

[54] *Id.*

with one another,"[55] which includes the "absolute right[] of personal security."[56] "Personal security include[s] the right to life and limb, and . . . to body (freedom from assault), health, and reputation."[57] In order to protect against violations of such rights, Coke and Blackstone identified the necessary remedy that immediately attaches upon injury done to a person: "[E]very subject of this realm, for injury done to him in goods, lands, or person, by any other subject . . . may take his remedy by the course of the law, and have justice, and right for the injury done to him . . . *speedily without delay.*" Indeed, "[t]he placement of access to [courts] provisions in states' bills of rights suggests that the drafters of state constitutions did not view the right as merely an operational detail of the courts but rather as an individualized, particularized and positive right . . . ."[58]

The General Assembly, through Chapter 216C, has created a mandatory delay affecting the ability of all medical-malpractice claimants to seek *any* redress, unless all parties either "validly agree[] . . . to a binding arbitration procedure"[59] or agree to bypass the medical review panel process.[60] Chapter 216C takes away the ability of medical-malpractice claimants to seek immediate redress in the forum of the claimant's choosing. Chapter 216C contravenes one of the main purposes of Section 14—to prohibit legislatively

---

[55] Phillips, *supra* note 1 at 1320.

[56] Phillips, *supra* note 1 at 1321 (citing Blackstone, *supra* note 42 at 125 and 129).

[57] Phillips, *supra* note 1 at 1321 n. 44

[58] Buenger and De Muniz, *supra* note 12 at 202.

[59] KRS 216C.020(1).

[60] KRS 216C.030(1).

created delays in the ability of a claimant to seek immediate redress in the courts of the Commonwealth for common-law personal injury, i.e., to prevent the people from being "ordered . . . not to proceed with particular causes[] and [from] justice [being] delayed."[61]

Section 14 provides for courts to be "open." Section 14 affords "every person for an injury done him in his . . . person . . . remedy by due course of law, and right and justice administered without . . . delay." Forcing a medical-malpractice claimant seeking immediate redress for an alleged common-law personal-injury to be at the mercy of the other parties involved when attempting to bypass the panel process cannot satisfy Section 14's mandate that "[a]ll courts . . . be open" and every Kentuckian "shall have remedy by due course of law, and right and justice administered without . . . delay."

Admittedly, delays are inherent in every adjudicatory proceeding. What makes the delay imposed by Chapter 216C unconstitutional is the General Assembly's *usurpation* of a claimant's freedom to access the adjudicatory method of his or her choosing at the time of his or her choosing. Chapter 216C is in contravention of Section 14 because *no adjudication whatsoever* takes place of a medical-malpractice claimant's claim unless a valid agreement has been made to arbitrate or bypass the panel process. Claimants may only seek immediate redress for their common-law personal-injury claims through arbitration or the courts if, and only if, the adverse parties agree to proceed through arbitration or the courts. This is an untenable restriction on the

---

[61] Buenger and De Muniz, *supra* note 12 at 200–01 (quoting *Dabbs*, 14 Tenn. at 137–38).

18

exercise of the individual's right to receive "remedy by due course of law, and right and justice administered without . . . delay" from an "open" court system.[62]

The mandatory imposition of a delay in seeking immediate redress for a common-law personal-injury claim in the adjudicatory forum of the claimant's choosing cannot amount to "due course of law," because it is as though *no* "course of law" is taking place whatsoever. No "right and justice" is being "administered" at all. And, not only have the courts become closed, in contravention of the mandate that they "shall be open," but seemingly every dispute-resolution process for malpractice claims has been closed, unless all parties agree to arbitrate or bypass the panel process.

Justice Keller suggests that we have failed to consider what the phrase "due course of law" was intended to entail, seemingly glancing over the wise words of the Kansas Supreme Court that we borrow:

> It is not an easy task to deduce either from reason or the authorities a satisfactory definition of . . . "due course of law." We feel safe, however, . . . in saying these terms do not mean any act that the Legislature may have passed if such act does not give to one opportunity to be heard before being deprived or property, liberty, or reputation, or having been deprived of either does not afford a like opportunity of showing the extent of his injury and give an adequate remedy to recover therefor. Whatever these terms may mean more than this, *they do mean due and orderly procedure of courts* in the ascertainment of damages for injury, to the end that the injured one "shall have remedy"—that is, proper and adequate remedy—thus to be ascertained. *To refuse hearing and remedy for injury after its infliction is small remove from infliction of penalty before and without hearing.*[63]

---

[62] Ky. Const. § 14.

[63] *Hanson v. Krehbiel*, 75 P. 1041, 1043 (Kan. 1904).

Chapter 216C "refuse[s] hearing and remedy for injury after its infliction"[64] by forcing alleged wronged claimants to wait before they can begin the process of seeking redress. "Those terms . . . 'due course of law' . . . do not mean merely an act of the General Assembly. If they did, every restriction upon legislative authority would be at once abrogated."[65]

Chapter 216C is an unacceptable deviation from the "[t]he right of every individual in society to access a system of justice to redress wrongs."[66] Instead of affording claimants the ability to choose the process of redress they wish at the time they wish to exercise it, Chapter 216C forecloses all immediate access to any system of justice unless the other side agrees. Access to the adjudicatory method of their choice for *immediate* redress of common-law personal-injury claims is a constitutional right that all claimants have, unless they choose to give it up; the government cannot take away that right.

We do note, however, that proceeding through an alternative means of adjudication of a claim is not per se unconstitutional under Section 14. Whether through arbitration, mediation, administrative proceedings, or some other form of dispute-resolution process, if a claimant (1) has voluntarily agreed to seek redress of their common-law claims through that process and (2) has meaningfully waived access to the courts, then proceeding through a dispute-resolution process outside the court system that resulted in a delayed adjudication of a claim would, nevertheless, seem to pass constitutional muster

---

[64] *Id.*

[65] *Hoke v. Henderson,* 15 N.C. 1, 15 (N.C. 1833).

[66] *O'Bryan,* 892 S.W.2d at 578.

under Section 14. But under Chapter 216C, common-law personal-injury claimants have no ability to seek *any immediate redress from the adjudicatory forum of their choosing* unless all parties agree to bypass the panel process. Under these circumstances, with their backs against the wall, claimants choosing to arbitrate cannot be said to have meaningfully waived their right to immediate access to the courts.

We must also point out that the remedy guarantee of Section 14 applies only to claims, "for an injury done [to a claimant] in his lands, goods, person or reputation."[67] And the protections of Section 14 apply only to *claims originating out of the common law.*[68] If the legislature affords a right to claimants outside the common law, then a delay in adjudication of that claim is not per se unconstitutional under Section 14. Section 14 only prevents the legislature from encroaching upon the realm of the judiciary, the creator of the common law, by imposing mandatory delays in the adjudication of common-law claims grounded in claims "for an injury done [to the claimant] in his lands, goods,

---

[67] Ky. Const. § 14; *see Mullins v. Manning Coal Corp*, 938 S.W.2d 260, 263 (Ky. 1997) ("An employee's right to occupational disease benefits is purely statutory in nature and does not fall under the ambit of § 14 of the Kentucky Constitution."); *see also Adkins v. R & S Body Co.*, 58 S.W.3d 428 (Ky. 2001); *Shamrock Coal Co. v. Maricle*, 5 S.W.3d 130 (Ky. 1999).

[68] *See Adkins*, 58 S.W.3d at 430 ("Unlike the common law remedy for personal injury, the statutory remedy for injured workers is not predicated on redressing a tortious act . . . . Any rights that a worker acquires to a remedy under Chapter 342 are purely statutory and, therefore, do not come within the ambit of Section 14 of the Kentucky Constitution . . . ."); *Shamrock Coal*, 5 S.W.3d at 134 ("There was no common law cause of action for non-disabling category one pneumoconiosis in existence at the time of the adoption of the present Constitution; therefore, the jural rights doctrine is inapplicable.").

21

person or reputation."[69] Here, medical-malpractice claims, a subset of personal-injury and wrongful-death claims, have been a recognized part of the common law for centuries,[70] and as such, the legislature cannot delay claimants from seeking immediate redress of such claims through the courts.

Lastly, there is no support, either from the text of Section 14, or from case law interpreting that provision, to interpose a "reasonableness" evaluation of the delay to determine if a delay can, in some circumstances, be constitutionally tolerable. "Where a constitutional provision is free from all ambiguity there is no room for interpretation or addition. It must be accepted by the courts as it reads."[71] "The basic rule . . . is to interpret a constitutional provision according to what was said and not what might have been said; according to what was included and not what might have been included."[72] "Neither legislatures nor courts have the right to add to or take from the simple words and meaning of the constitution."[73] Finally, "It is hornbook law that in interpreting Constitutions the words employed therein should be given the meaning and significance that they possessed at the time they were employed,

---

[69] Ky. Const. § 14; see *Mullins*, 938 S.W.2d 260 at 263 ("An employee's right to occupational disease benefits is purely statutory in nature and does not fall under the ambit of § 14 of the Kentucky Constitution."); *Adkins v. R & S Body Co.*, 58 S.W.3d 428 (Ky. 2001); see also *Shamrock Coal Co. v. Maricle*, 5 S.W.3d 130 (Ky. 1999).

[70] Kathy Kendall, *Latent Medical Errors and Maine's Statute of Limitations for Medical Malpractice: A Discussion of the Issues*, 53 Me. L. Rev. 589 (2001) (tracing the origin of medical malpractice claims to 4050 B.C. Sumer, which required negligent healers to pay their victims an amount of money proportional to the degree of disability incurred).

[71] *Talbott v. Public Serv. Commn.*, 163 S.W.2d 33, 38 (Ky. 1942).

[72] *Pardue v. Miller*, 206 S.W.2d 75, 78 (Ky. 1947).

[73] *Jefferson Cnty. ex rel. Grauman v. Jefferson Cnty. Fiscal Court*, 117 S.W.2d 918, 924 (Ky. 1938).

and the one that the delegates of the convention that framed the instrument, and the people who voted their approval of it, intended to express and impart."[74] Section 14, originally written and adopted in 1792, does not proscribe the creation of "undue" or "unreasonable" delay on a Kentuckian's access to due course of law; Section 14 plainly proscribes delay.

The Commonwealth argued at oral argument that this Court has never interpreted Section 14 in such an absolutist way. But our research fails to uncover a single case where the General Assembly attempted to foreclose a common-law personal-injury claimant's right to immediate adjudicatory redress. This Court has never interpreted Section 14 in such an absolutist way because this Court has never been called upon to interpret Section 14 against a statutory framework like Chapter 216C.

Justice Keller questions our ability to reconcile the strict reading of Section 14 in this case versus our reading of Sections 59 and 60 in *Zuckerman v. Bevin*.[75] The reconciliation is this: there is no ambiguity in the word *delay*, while the word *special* found in Sections 59 and 60 is fraught with ambiguity. Special legislation is a vague term that has been defined and refined by precedent from this Court. Such is not the case with the terms *without delay* in Section 14.

---

[74] *City of Lexington v. Thompson*, 61 S.W.2d 1092, 1096 (Ky. 1933).
[75] 2018-SC-000097-TC (Ky. Nov. 15, 2018).

We must acknowledge that the majority of our sister courts have upheld the constitutionality of statutes establishing medical review panels.[76] But a minority of our sister courts have struck down the entirety or some provisions of medical review panel acts based on the same open-courts doctrine we apply to strike down Chapter 216C here.[77] And a review of the laws of the 17 states and U.S. territories currently having medical review panels further reveals support for our holding.[78]

Alaska, Hawaii, Virginia, and the Virgin Islands do not have an open-courts provision in their constitutions and governing documents. Louisiana and Delaware's respective open-courts provisions specifically modify "delay" with the word "unreasonable."[79] The highest courts in Indiana, Maine, and Montana read into their open-courts provisions a "reasonableness" evaluation of delay.[80] The highest courts in Massachusetts and New Hampshire did not

---

[76] *See Validity and construction of state statutory provisions relating to limitations on amount of recovery in medical malpractice claim and submission of such claim to pretrial panel*, 80 A.L.R.3d 583 (originally published in 1977, continuously updated).

[77] *See State ex rel. Cardinal Glennon Mem'l Hosp. for Children v. Gaertner*, 583 S.W.2d 107 (Mo. 1979); *Jiron v. Mahlab*, 659 P.2d 311 (N.M. 1983). North Dakota and Wyoming struck down their medical review panels, but not for reasons completely attributable to the open-courts doctrine. *See Arneson v. Olson*, 270 N.W.2d 125 (N.D. 1978); *Hoem v. State*, 756 P.2d 780 (Wyo. 1988). However, Wyoming subsequently amended its constitution, *see* Wyo. Const. Art. X, § 4(b), to allow for the creation of a medical review panel, which is now in place. Illinois struck down its version of the medical review panel, but that statutory framework is so different from Kentucky's that it is unwise to make such a comparison. *See Wright v. C. Du Page Hosp. Ass'n*, 347 N.E.2d 736 (Ill. 1976).

[78] Although several other states have other kinds of pretrial restrictions on the ability to hear medical malpractice suits, i.e., mandatory mediation or arbitration, the only issue before this court is the validity of the medical review panel process at hand.

[79] *See* La. Const. Art. I, § 22 ("unreasonable delay"); Del. Const. Art. I, § 9 ("unreasonable delay").

[80] *See Johnson v. St. Vincent Hosp., Inc.*, 404 N.E.2d 585 (Ind. 1980); *Irish v. Gimbel*, 691 A.2d 664 (Me. 1997); *Linder v. Smith*, 629 P.2d 1187 (Mont. 1981).

conduct an open-courts analysis regarding delay in their decisions.[81] The highest court in Idaho does not believe the open-courts doctrine applies to constrain the legislature's power to modify common-law personal-injury actions.[82] In Nebraska, the medical review panel process is not mandatory because the claimant may affirmatively waive his or her right to panel review, and for that reason, the Supreme Court determined the open-courts doctrine was not violated.[83] Kansas and Utah have not faced constitutional challenges to their respective medical review panel statutes. And as stated earlier, New Mexico struck down a portion of its medical review panel statutory framework as being unconstitutional, while Wyoming went so far as to amend its constitution to allow for such panels.

Indiana, Maine, and Montana have dealt with this issue, have similar language in their open-courts provisions to Section 14, and have chosen to apply a reasonableness standard to open-courts challenges.[84] Yet, we find the reasons these jurisdictions have done so unavailing.

Indiana has interpreted the pertinent part of its open-courts provision—"Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay"—as only applying to the

---

[81] *Paro v. Longwood Hosp.*, 369 N.E.2d 985 (Mass. 1977); *In re S. New Hampshire Med. Ctr.*, 55 A.3d 988 (N.H. 2012).

[82] *See Jones v. State Bd. of Med.*, 555 P.2d 399 (Ida. 1976).

[83] *See Prendergast v. Nelson*, 256 N.W.2d 657 (Neb. 1977) (noting that Neb. Rev. St. § 44–2840(4) states, "The claimant may affirmatively waive his or her right to a panel review, and in such case the claimant may proceed to file his or her action directly in court.")

[84] *See Johnson v. St. Vincent Hosp., Inc.*, 404 N.E.2d 585 (Ind. 1980); *Irish v. Gimbel*, 691 A.2d 664 (Me. 1997); *Linder v. Smith*, 629 P.2d 1187 (Mont. 1981).

legislature, and not the judiciary.[85] For the reasons stated in this opinion, we reject that interpretation. Montana believes "that access to the courts is not an independent fundamental right," and for that reason has applied rational-basis review when analyzing open-courts challenges in cases not involving other fundamental rights.[86] As explained above, however, an understanding of the history surrounding Section 14 and the reasons for its adoption satisfy us that immediate access to courts for the purpose of seeking redress of a common-law personal-injury claim is a positive right afforded by the framers of the Kentucky Constitution to all Kentuckians.

The Supreme Court of Maine has taken a statement by the U.S. Supreme Court in *Logan v. Zimmerman Brush Co.*[87] and used it in interpreting the language of the state's constitution. In *Logan*, the U.S. Supreme Court stated, "The State may erect reasonable procedural requirements for triggering the right to an adjudication . . . ."[88] These words have been the basis for Maine's adoption of a reasonableness requirement in its open-courts provision.[89] But *Logan* dealt with the Fourteenth Amendment of the U.S. Constitution, specifically, procedural due process, not an open-courts provision.[90] As Buenger and De Muniz note:

---

[85] *Smith v. Indiana Dept. of Correction*, 883 N.E.2d 802, 807 (Ind. 2008).

[86] *Linder v. Smith*, 629 P.2d 1187, 1190 (Mont. 1981).

[87] 455 U.S. 422 (1982).

[88] *Id.* at 437.

[89] *Irish v. Gimbel*, 691 A.2d 664, 672 (Me. 1997) (citing *Giberson v. Quinn*, 445 A.2d 1007, 1009 (Me. 1982)) (citing *Logan*, 455 U.S. at 437))).

[90] *Id.* at 428.

26

> There is no textual analogue to [the open-courts provision] in the Federal Constitution. A federal right "was not contained in the United States Constitution or in the federal Bill of Rights, no doubt because the law governing rights, duties, and liabilities between individuals with respect to the protection of 'person, property, or reputation' was deemed to be committed or reserved exclusively to the states."[91]

Chief Justice Phillips notes the same.[92] And the claimant in *Logan* was challenging federal agency procedures used for adjudicating a claimant's statutorily-created right for alleging employment discrimination.[93] In other words, *Logan* had nothing to do with a claimant's right to access the state courts for redress of a common-law personal-injury claim.

The entirety of Chapter 216C violates Section 14, and there is "no set of circumstances . . . under which the Act would be valid."[94] Therefore, we must declare the entire Act void as unconstitutional.

## III.  CONCLUSION.

Because Chapter 216C violates Section 14 of the Kentucky Constitution, the Act is void in its entirety. Accordingly, we affirm, for the reasons stated in this opinion, the judgment of the trial court.

All sitting. Hughes, VanMeter, and Venters, JJ., concur. Cunningham, J., concurs in result only by separate opinion. Keller, J., concurs in result only by separate opinion, in which Cunningham and Wright, JJ., join.

---

[91] Buenger and De Muniz, *supra* note 12 at 200 (quoting *Craftsman Builder's Supply, Inc. v. Butler Mfg. Co.*, 974 P.2d 1194, 1208 (Utah 1999)).

[92] Phillips, *supra* note 1 at 1309–10.

[93] *Id.* at 426–27.

[94] *Harris*, 338 S.W.3d at 229 (quoting *Rust*, 500 U.S. at 183)

CUNNINGHAM, J., CONCURRING IN RESULT:  I agree that the Medical Review Panel Act ("MRPA") violates our state constitution.  But, the infraction is our constitutional prohibition against special legislation.

Section 59(5) of the Kentucky Constitution states in pertinent part that: "The General Assembly shall not pass local or special acts concerning any of the following subjects, or for any of the following purposes, namely: . . . To *regulate the limitation* of civil or criminal causes . . . ." (emphasis added).

Having reviewed the Appellee's argument and the record of the case, it appears the MRPA is a special act designed to benefit health care providers as opposed to the classification of all other defendants facing tort claims.  This special legislation benefits and protects health care professionals without affording the same protection to other tort defendants—even other types of malpractice targets.  And it does so to the detriment of claimants against them by regulating the limitation of civil causes of action.

This Court has clear precedent concerning the purpose of Section 59 of the Kentucky Constitution:

> The primary purpose of Section 59, and by extension Section 60, is to "prevent special privileges, favoritism, and discrimination, and to [e]nsure equality under the law." *Ky. Harlan Coal Co. v. Holmes*, 872 S.W.2d 446, 452 (Ky. 1994).  These two sections of our Constitution prevent the enactment of laws that do not "operate alike on all individuals and corporations." *Jefferson Cnty. Police Merit Bd. v. Bilyeu*, 634 S.W.2d 414, 416 (Ky. 1982) (citing *City of Louisville v. Kuntz*, 104 Ky. 584, 47 S.W. 592, 592–93 (1898)).

*Louisville/Jefferson Cnty. Metro Gov't v. O'Shea's-Baxter, LLC*, 438 S.W.3d 379, 383 (Ky. 2014).

Stated differently, "[a] special law is legislation which arbitrarily or beyond reasonable justification discriminates against some persons or objects

28

and favors others." *Board of Ed. of Jefferson Cnty. v. Board of Ed. of Louisville*, 472 S.W.2d 496, 498 (Ky. 1971).

"In order for legislation to be permissible under Section 59 of the Kentucky Constitution: '(1) It must apply equally to all in a class, and (2) there must be distinctive and natural reasons inducing and supporting the classification.'" *Yeoman v. Commonwealth*, 983 S.W.2d 459, 466 (Ky. 1998).

Analogous precedent relating to Section 59(5) "limitations" on bringing lawsuits is embodied by *Tabler v. Wallace*, 704 S.W.2d 179 (Ky. 1985). *Tabler* was a case involving the unconstitutional violation of Section 59(5) by a statute granting a special limitation on an action for losses suffered as a result of construction errors. In that case, under KRS 413.135, individuals involved in "design, planning, supervision, inspection or construction of any improvement to [the] real property" were immune from suit if claims were not brought within five years of completion of the construction project. Because the statute effectively barred litigation of losses from construction—as those losses often occurred after the five-year period—this Court struck down that legislation as violating Section 59(5). *Tabler*, 704 S.W.2d at 180-85.

The *Tabler* court cited other precedents for violations of Section 59. *See, e.g., Gorley v. City of Louisville*, 47 S.W. 263 (Ky. 1898); *City of Louisville v. Kuntz*, 47 S.W. 592 (Ky. 1898); *City of Louisville v. Louisville Taxicab & Transfer Co.*, 238 S.W.2d 121 (Ky. 1951); *Commonwealth v. McCoun*, 313 S.W.2d 585 (Ky. 1958); *City of Louisville v. Klusmeyer*, 324 S.W.2d 831 (Ky. 1959).

Lastly, a bit of history drives this point home. It is no secret to those who have studied the original construction of our state constitution that much

29

of this 1891 ratification was composed to lessen the undue influence of corporate interests, primarily railroads, upon our legislature. Section 59 was aimed at preventing railroads from receiving the same kind of favored treatment that medical providers are given in the legislation at bar.

Times change, and the railroad's status as a powerful political lobbyist has faded. But new economic interests have arisen to take its place. Here, the economic interest of the medical profession seeks special favor. All one has to do to see how the proscriptions of Section 59 fit the current case is to think medical provider, rather than railroad.

I, therefore, concur in result.

KELLER, J., CONCURRING IN RESULT ONLY: The majority opinion holds that, pursuant to Ky. Const. § 14, any delay to bringing a personal injury or wrongful death action is unconstitutional. I cannot wholly concur in such a holding because I believe the ramifications of such a broad holding are, at this time, unknown and unforeseeable. Kentucky Constitution § 14 states, *in toto*:

> All courts shall be open, and every person for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay.

We can clearly see a constitutionally-mandated reverence for Kentuckians' rights to access the courts within these provisions. I agree with the majority's respectful stance of our Constitution's guarantee of every citizen's right to open courts.

In recognizing this fundamental right to open courts through § 14, however, the majority has decided that this constitutional provision guarantees

30

that right without *any* delay. The majority has held that there is no

"reasonableness" standard within § 14 and the provision "plainly proscribes

delay" of any kind. I cannot fully concur in this holding. The provision states

that there can be no delay and every person "shall have remedy by due course

of law." But what is "due course of law"? I would posit that such a phrase

could possibly embrace procedural requirements that the legislature creates.

Such requirements must, of course, comport with the remaining constitutional

provisions. But I am not so convinced that the framers intended the General

Assembly to be so restricted from placing otherwise constitutionally sound

processes for litigants to gain access to the courts.

I would also add that the majority's strict, fundamentalist interpretation

of § 14 is at odds with the majority holding and separate concurring opinion in

our case rendered today, *Zuckerman v. Bevin*, Nos. 210-SC-000097-TG and

2018-SC000098-TG. There, the majority of the Court determined that there

was no violation of § 59, the special legislation provision of Kentucky's

constitution. The majority opinion dismissively states that the Right to Work

Act (RTWA), at issue there, "does not single out any particular union, industry

or employer."

I fervently disagree with such a statement, which is why I dissented from

the majority opinion in that case. In *Zuckerman*, the majority employs a loose

interpretation of § 59 to determine that the RTWA is constitutional. Rather

than *strictly* applying § 59, prohibiting "special acts ... for ... the purpose[] ...

[t]o regulate labor, trade, mining or manufacturing," the majority of this Court

has held that we must draw the class more narrowly to sustain the validity of

31

the RTWA. In a separate concurring opinion, some of this Court has determined that the test developed to interpret the application of § 59 is "untenable." As that opinion states, whether a law is constitutional depends on how the class is drawn; the test is criticized and the concurring opinion finds that "special legislation requires a flexible analysis."

Yet, in the case at bar, the majority of this Court insists on an austere, authoritarian interpretation of § 14, prohibiting any and all delay prior to bringing an action for personal injury or wrongful death. How can this Court reconcile these two separate interpretations? I fail to perceive how, with consistent constitutional interpretation, this Court can be more "flexible" in its approach to § 59 yet adhere to a strict and rigorous interpretation of §14. I interpret § 59 in accordance with the 1891 Constitutional debates, plain reading of the constitutional language, and our case law. Such an interpretation leads to the conclusion that the intent of the RTWA is to negatively impact unions and is, thus, unconstitutional special legislation. I interpret § 14 from the language of the Constitution, as an entire section. Kentucky Constitution § 14 prohibits delay without "due course of law." The majority here fails to consider what that phrase was intended to entail.

I concur in the result, here, because the MRPA clearly interferes with a fundamental right to access the courts in an unreasonably broad way. However, I cannot say that *any measure* the legislature may create to impose procedural steps *prior* to the bringing of an action under § 14 would *always* be unconstitutional. By thus holding, we begin to invade the role of the legislature and tie the General Assembly's hands. The MRPA overstepped

constitutional bounds. But I do not agree that any similar measure will, *ipso facto*, violate §14 because it creates *any* delay before bringing an action.

Therefore, I concur in the majority's result only.

Cunningham and Wright, JJ., join.


COUNSEL FOR APPELLANT:

Catherine Elaine York
Johann Frederick Herklotz
Matthew Kleinert
Cabinet for Health and Family Services

Mark Stephen Pitt
Stephen Chad Meredith
Matthew Kuhn
Office of the Governor


COUNSEL FOR APPELLEE: EZRA CLAYCOMB, A MINOR, BY AND THROUGH HIS NEXT FRIEND, NATURAL GUARDIAN AND PARENT, TONYA CLAYCOMB AND TONYA CLAYCOMB, ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

J. Guthrie True
True Guarnierie Ayer, LLP

Paul A. Casi II
Jeffrey Wayne Adamson
Paul A. Casi, II, P.S.C.


COUNSEL FOR AMICUS CURIAE: ST. ELIZABETH HEALTHCARE AND LEADINGAGE KENTUCKY

David V. Kramer
Mark David. Guilfoyle
Michael Enzweiler
Dressman Benzinger LaVelle PSC

COUNSEL FOR AMICUS CURIAE: ROBERT STIVERS, KENTUCKY SENATE PRESIDENT

David E. Fleenor
R. Vaughn Murphy
Tyler Peavler
Office of the Senate President

COUNSEL FOR AMICUS CURIAE: KENTUCKY MEDICAL ASSOCIATION AND THE AMERICAN MEDICAL ASSOCIATION

Sarah Spurlock
Charles J. Cronan IV
Bethany A. Breetz
Stites & Harbison PLLC

COUNSEL FOR AMICUS CURIAE: KENTUCKY ASSOCIATION OF HEALTH CARE FACILITIES

Bryan Todd Thompson
Mitchel Terence Denham
Joseph Wright
Thompson Miller & Simpson PLC

COUNSEL FOR AMICUS CURIAE: KENTUCKY HOSPITAL ASSOCIATION

Wesley Reed Butler
Holly Iaccarino
Barnett Benvenuti & Butler PLLC